[L. A. No. 4885.   Department Two.—June 9, 1919.]

## NETTIE McLAUGHLIN et al., Respondents, v. LOS ANGELES RAILWAY CORPORATION, Appellant.

[1] Negligence—Death of Pedestrian—Collision With Street-car —Cars Approaching in Opposite Directions — Negligence of Motormen—Findings—Evidence.—In this action for damages for the death of a pedestrian, who upon being caught between an east and a west bound street-car stepped back from the latter after it had been stopped by the motorman and was killed by the eastbound car, it is held that there was neither warrant nor support for the finding that the motorman of the west-bound car was guilty of negligence in bringing his car to a stop across the path of the deceased; but that the finding that the motorman of the eastbound car was negligent in not sooner bringing his car to a stop, is supported by the evidence.

[2] Id.—Care Required of Motorman.—Under such circumstances the motorman cannot be held to have been negligent merely because he did not make the best choice, since he is bound to use only that degree of care which a reasonably prudent and skillful motorman would have used under all the circumstances of a situation with which he was suddenly confronted and which were only visible to him from the platform of his moving car.

[3] Id.—Prejudicial Misconduct of Court — Distances in Stopping Cars—Resort to Outside Evidence.—In such action, it was prejudicial error, during the argument of the case, for the trial court, in the face of objection, to discuss with counsel for the plaintiff and ultimately receive and review the evidence adduced in another case which had been tried before the same court relative to the distances within which cars of a company other than the defendant could be stopped, in view of the meager character of the evidence upon which the finding of the negligence of the east-bound motorman rested, and such error was not cured by the certificate of the court that its decision was wholly based upon other and competent evidence.

[4] Id.—Evidence—Cross-examination of Expert Witness—Bias in Favor of Defendant—Prejudicial Error.—It was prejudicial error for the court, in the face of sufficient objection, in such action, to permit the plaintiff to cross-examine its own expert witness for the purpose of showing that he was biased in favor of the defendant.

[5] Id.—Evidence—Bias of Own Witness—Proof of Hostility or Bias Inadmissible.—Where a witness is unexpectedly hostile to or biased against the party by whom he is called, such party cannot introduce evidence tending to show such hostility or bias.

[6] Id.—Impeachment of Witness — Procedure.—Where a witness unexpectedly gives damaging testimony against the party calling him, it is permissible, under the provisions of section 2049 of the Code of Civil Procedure, to show that the witness had previously made statements inconsistent with his testimony, upon the theory that the party was taken by surprise by the adverse testimony; and the proper method of impeachment is to formulate the question so as to embrace the very statement, at least in substance, and to ask the impeaching witness for a categorical answer whether the statement was made, giving the circumstances of times, places, and persons present.

APPEAL from a judgment of the Superior Court of Los Angeles County. Grant Jackson, Judge. Reversed.

The facts are stated in the opinion of the court.

Gibson, Dunn & Crutcher and Norman S. Sterry for Appellant.

Jones & Evans and Mattison B. Jones for Respondents.

LENNON, J.—This is an appeal by the defendant from a judgment in the sum of $750, entered in favor of the plaintiffs, who sued as the children and sole heirs of Mrs. Adelia Ackerson, to recover damages for her death, which was alleged to have been caused by the negligence of the defendant in the operation of two street-cars on East Seventh Street, in the city of Los Angeles. The action was tried by the court without a jury.

The undisputed facts are these: Mrs. Ackerson started to cross from the south to the north side of East Seventh Street at a point between San Julian and Wall Streets at about 6 o'clock on the evening of January 15, 1915. The defendant was operating a street-car line with a double track on this street. At the time in question, cars were approaching from opposite directions along these tracks at a reasonable rate of speed. No other vehicles were present. It was after nightfall, but the street was artifically lighted and the headlights and interior lights of both cars were burning brightly. The deceased, although she was sixty-six years of age, was an active woman in full possession of her faculties save for being a little hard of hearing. Both motormen saw her and sounded their bells vigorously. Nevertheless, the deceased

did not hesitate in her course across the street.  She looked neither up nor down the street.  When the motorman on the west-bound car realized that she was evidently bent upon going upon and across the tracks, he brought his car to a stop so that the rear portion thereof stood across the path which the deceased was pursuing.  Meanwhile, when the deceased was within two or three feet of the south rail of the east-bound track, the motorman on the east-bound car cut off his current and put on his air-brakes.  The deceased entered upon the east-bound tracks, and, seeing the west-bound car in her path, hesitated and stopped and as she did so was struck by the east-bound car, sustaining injuries from which she died.

The trial court found that the deceased, under all of the circumstances, was guilty of negligence in entering upon the east-bound tracks.  It is not disputed that this finding is supported by the evidence.  Nor is it disputed that up to the time when the deceased came within two or three feet of the south rail of the east-bound track, both motormen were justified in believing that she would avoid danger by exercise of due care.  Nor can the finding be disputed that the deceased was not guilty of negligence in hesitating and stopping when she discovered the west-bound car in front of her.  The undisputed situation, therefore, at the time it became evident that the deceased was going to attempt to cross the tracks was this: (1) She had negligently placed herself in a place of danger from which it was apparent that she could not or would not extricate herself, and (2) this fact was realized by both motormen.  Inasmuch as the deceased was, admittedly, guilty of no further negligence contributing to her injury and death, the doctrine of "last clear chance" comes into play, and must cover and control the determination of the only question involved in the claimed insufficiency of the evidence to support the court's findings of negligence.  That question is this: Were the motormen, or either of them, guilty, after the time referred to, of a failure to use due care to avoid the accident?  Responding to this question, the trial court found as a fact that both motormen were guilty of negligence after the discovery of the predicament of the deceased and apparently rested its judgment for the plaintiffs upon this finding.

We will first consider and discuss the question of the negligence charged against the motorman on the west-bound car.

Upon this phase of the case, the finding of the trial court was: "That the defendant, through its motorman in charge of its west-bound car running on its track on East Seventh Street, carelessly and negligently stopped said car in front of and in the direct path of the said deceased without any cause or reason therefor, and the said deceased was prevented, through said negligence and carelessness of the defendant and its said servant, from passing in the rear thereof in safety and without injury to her; that if said west-bound car had not been stopped in front of and in the direct path of said deceased, as aforesaid, she would have passed in safety over the south track and out of the zone of danger from the defendant's car running east on its said south track; that because of said west-bound car being carelessly and negligently stopped and operated, as aforesaid, the said deceased, when at a position between the said tracks of the said defendant, and while in the danger zone of the defendant's east-bound car, hesitated and stopped and was instantly struck by one of the electric cars of the defendant, which was then and there operated east on said south track by the defendant and its servants in charge of said car at a reckless rate of speed, and the said deceased was thereby thrown violently to said street and was then and there seriously injured, from which injuries she died in about four hours thereafter. . . . "

[1]    The correctness of the fundamental facts found by the trial court concerning the operation of the cars and the movements and conduct of the deceased are not disputed, but it is earnestly insisted, and justly so, we think, that these fundamental facts neither warrant nor support the finding that the motorman on the west-bound car was guilty of negligence in bringing his car to a stop across the path of the deceased. Practically the only evidence upon this phase of the case is to be found in the testimony of the motorman on the west-bound car and the admitted fact in the case that there was a space of about three feet between the cars in which the deceased could have stood in safety. The motorman testified as follows: "Relative to the south track, she [the deceased] was, I suppose, two or three feet from the south track—she hadn't stepped over the rail yet, or on either track when I last saw her. As to the east-bound car's front end at that instant— well, I suppose he was somewhere between half a car's length, maybe a little over, in front of me. The woman was still

walking north when I last saw her—hadn't slowed up a bit, coming in the direction of my car. I stopped my car as soon as I could, and that was pretty quick. I had an idea—I was pretty near positive that she was going to come on and with my car stopped she could get up to the side of it and be out of the way of the other—of course if they were both going she couldn't so well. I think I stopped before the impact, before she got in there.''

It being conceded that the deceased was negligent, the neg-ligence of the west-bound motorman can justify the judgment only upon the theory that he, as well as the east-bound motorman, had a last clear chance to avoid injuring the deceased. It would be without precedent, so far as we are aware, to apply the doctrine of ''last clear chance'' where, as here, the injured person was never in danger from and not touched by the instrumentality over which the individual charged with negligence had control. Conceding that the west-bound motorman did have a last clear chance of avoiding injuring the deceased, the fact remains that he did avoid injuring her. She was imperiled in the first instance and ultimately injured and killed by the impact of the east-bound car. We should hesitate to hold that it was negligent to stop a street-car in a situation where a collision was imminent between a pedestrian and some other moving vehicle which was completely under the control of a third person. Ordinarily, a street-car standing still can hurt nobody. On the other hand, if it be kept in motion in the presence of an impending crisis involving possible injury to a pedestrian by other vehicles in the immediate vicinity, there immediately arises the peril of the pedestrian's being thrown under the wheels of the moving car. Particularly is this so in a situation such as that presented in the instant case. The deceased was, to the knowledge of the west-bound motorman, about to step upon the east-bound track, thereby placing herself in immediate peril from a car approaching on that track and a few feet to her left. Under these circumstances, the west-bound motorman, we think, was justified in anticipating that while the speed of the east-bound car might be checked to the extent of avoiding striking a fatal blow, nevertheless, that car might very possibly throw the deceased under the trucks of his own car. There were, then, two courses open to him to avoid the peril made possible by such a situation. He could either

have stopped the car, as he did, or he could have speeded up his car in an attempt to get it completely out of the danger zone. The first course, and the course actually adopted, would ordinarily result in safety. The latter course would very likely be fraught with peril. A slight miscalculation of the rate of speed of either car or of the deceased might perchance result fatally. We do not think that the motorman of the westbound car was required to assume any such risk. True, the court below found that if the motorman had speeded up his car the deceased would have passed across the tracks in safety. But that fact alone is not sufficient to charge said motorman with negligence. It must further appear that a reasonably prudent and skillful motorman would not have done as he did. The court's conclusion obviously was based upon a last analysis of the peril of the situation as revealed by the testimony of the numerous witnesses who had viewed the accident from various positions. [2] Clearly, the motorman cannot be held to have been negligent merely because he did not make the choice which such an analysis perhaps shows would have been the best choice. He was bound to use only that degree of care which a reasonably prudent and skillful motorman would have used under all of the circumstances of a situation with which he was suddenly confronted and which were only visible to him from the platform of his moving car. Assuming that the motorman was bound to surmise that the deceased might have succeeded in crossing the east-bound track ahead of the on-coming car, still he can only be held negligent in stopping upon the theory that he was bound, in addition, to anticipate that the deceased would hesitate and step back upon seeing his car in her path. True, the court found that the deceased was not negligent in so stopping and stepping back, but that is a very different thing from finding that the motorman was bound to anticipate that she would do so. Clearly, it would have been the wise and prudent thing for the deceased to have stopped and stood in the clear space between the cars until the east-bound car had stopped or gone by. The motorman was justified, we think, in assuming that the deceased would thus have endeavored to save herself from injury.

This brings us to a consideration of the negligence charged and found against the motorman of the east-bound car. Upon this phase of the case, the finding of the trial court was as

follows: "That the said defendant, through its motorman in charge of said east-bound car, carelessly, negligently, recklessly, and wantonly ran said car against the said deceased while she was between the said tracks of the said defendant, and known to said motorman in charge of said east-bound car to be in a dangerous position; that the said motorman in .charge of said east-bound car, after discovering and knowing that the said deceased was in a dangerous position, had ample time and distance within which to stop his said car by the exercise of ordinary care before striking the deceased; that the said motorman did not exercise ordinary care in operating said east-bound car to avoid injuring her, but, on the contrary, recklessly and wantonly ran said car against her and thereby caused her death as aforesaid; that the said motorman in charge of said east-bound car saw said deceased from the time she left the south curb until she was struck, as aforesaid, and knew when she was approaching the danger zone of his car; that when deceased was two or three feet south of the south rail of the east-bound track the motorman threw off his current and applied his brakes in an endeavor to stop said car, but that he did not stop said car as soon or as quickly as he should and could have stopped said car; that at said time the deceased was a sufficient distance in advance of the car so that the same should and could have been stopped by the exercise of ordinary care in operating said car; that the motorman had a clear opportunity to avoid injuring the deceased after he knew her to be in a place of danger, but recklessly and wantonly failed to operate his said car to that end; that the said deceased was not careless or negligent in hesitating and stopping, as aforesaid."

The sum and substance of these particular findings is that while the motorman of the east-bound car was seasonably vigilant in an endeavor to bring the car to a stop and thereby avoid the accident, nevertheless, he was guilty of negligence in failing to fully avail himself of the last clear chance to avoid injuring the deceased in that he failed, with the means at hand, to effectively stop the car at a distance from the deceased at which it could and should have been so stopped. Of course, if this be so, it must follow that the negligence of the deceased in going upon the east-bound track did not ultimately contribute proximately to her injury and death. A review of the evidence upon this phase of the case compels the

conclusion that the findings in so far as they declare that the motorman did not stop the car as quickly as he could and should have done must have been made and based upon one of two theories: (1) That although the motorman threw off the current and applied the brakes in an endeavor to stop the car when the deceased was two or three feet of the south rail of his track, nevertheless, he did not apply the brakes as vigorously and as effectively as might and should have been done, or (2) that the motorman should have used the reverse instead of the brakes, or that, simultaneously and in conjunction with the use of the brakes, he should have resorted to the use of the reverse.

The evidence of the plaintiff responding to this phase of the case is to be found in the testimony of two passengers on the east-bound car and the testimony of two expert or rather opinion witnesses. One of these opinion witnesses was a policeman who had formerly been a motorman, while the other was a laborer who at one time had operated a street-car for the period of eleven months. Neither of these witnesses had ever been in control of a car of the type which struck the deceased and caused the injuries resulting in her death. These witnesses, in effect, testified that it was their opinion that the east-bound car, under all of the shown circumstances, might have been stopped sooner than it was. From a perusal of their testimony, it appears that their opinions were not based upon any experiment made with the car in question, similarly loaded, on a similar grade and with the same air pressure. To the contrary, it appears that their opinions were based wholly upon their experience in the handling of different cars, differently loaded, on different grades, with different amounts of air pressure and with different circumstances calling for the sudden stoppage of the car. One of these witnesses stated that he was merely giving estimates of the distances within which a car might be stopped and that he could not tell with any degree of precision the distance within which a car might be stopped when going at a specified speed. The other witness gave it as his opinion that there was not any given distance in which a car might be stopped. Both witnesses were practically agreed that the same car will stop within different distances under apparently the same operation and conditions. With reference to the method of effectively stopping in an emergency

a car going from eight to ten miles an hour within a distance
of twenty feet, one of these witnesses declared that he would
in addition to the use of the air resort to the reverse—that
is to say, he would throw off the current, pull the reverse
lever, and then feed the current back slowly, during which
operation the car would continue its forward movement until
checked by the gradual extinguishment of its momentum.
This witness, however, admitted that a sudden resort to the
reverse was fraught with difficulty and very likely to result in
failure.   Finally, he gave it as his opinion that "in ninety-
nine out of one hundred cases the air will stop quicker and
better than the reverse . . . a person gets excited, and they
throw the controller too far and it throws the overhead. If you
throw your overhead you are powerless, if your wheels don't
freeze to the rail.   The brake is the best thing to stop the car,
provided your air is all right.   Assuming the brake is work-
ing and the air is all right, the brake is the best and safest
means to make a service or emergency stop."   The other wit-
ness was also of the opinion that the reverse should be re-
sorted to for an emergency stop, and, in this behalf, testified:
"I would use the reverse in an emergency if the track was
kind of bad, and I saw that I was going to hit the person,
I believe that I would reverse—I don't know whether it would
do much good.   At times it does, and at times it don't; at
times if you slug a car it will slide before it takes effect.   You
have got to reverse it, and then throw your controller clear
around, that throws your overhead; then it takes probably
a second or two to take hold."   We shall consider elsewhere
the testimony of the passengers on the car.

The evidence offered upon behalf of the defendant upon
this phase of the case was elicited from several witnesses—
motorman and instructors of motormen actively and daily en-
gaged for many years in their respective occupations—whose
testimony, in substance, was that there was not a grade at
the scene of the accident sufficient to make any appreciable
difference in stopping a car going either way; that a quicker
and better stop could be made with the air than with the re-
verse; that if the air was working right the reverse should
never be used in an emergency stop; that a better stop would
be obtained by using either the reverse or the brakes rather
than by using both at the same time; that the brakes stopped
the car by retarding the revolutions of the wheels, while the

reverse would stop it by revolving the wheels in an opposite direction from that in which the car was first proceeding; that the result of the use of the air and of the brakes together was to reduce the effect of each, and that while the brakes will produce a stop much quicker than the reverse, the reverse alone will result in a stop quicker than when it is used in conjunction with the brakes. Three of these witnesses were in substantial accord in the opinion, based upon many years of experience and actual tests made, that a loaded car of the type in question could not be brought to a full stop in any distance short of from fifty to sixty feet. During the examination of one of these witnesses, it was developed that the defendant, as a result of a series of experiments, had issued to its employees written instructions, which were in force at the time of the accident, designating the method and means to be employed by motormen when required to make emergency stops. These rules, which were produced and admitted in evidence upon the demand of the plaintiff, provided that "In making emergency stops for any purpose, always rely on your air-brakes. Never reverse unless you have less than thirty pounds of air. (Or brakes become useless or ineffective.)" Again, one of defendant's bulletins, introduced in evidence under similar circumstances, states that "in making tests it has been found that the quickest and shortest stops can be made with the air-brakes." It was also shown in evidence upon behalf of the defendant, and not disputed by the plaintiff, that the car in question was, at the time of the accident, equipped with an air-gauge carrying minimum forty-five and maximum sixty-five pounds pressure and that the air was working right carrying pressure within the minimum and maximum limits.

Considering this evidence as a whole, there is not, we think, any substantial conflict existing between the opinions of the witness for the plaintiff and those for the defendant as to the wisdom of using the reverse alone, or in conjunction with the air-brakes, for the purpose of making an emergency stop. To the contrary, it would appear, it seems to us, that all of the witnesses were substantially agreed that the use of the brakes alone in an emergency was the best way to stop a car and all that an ordinarily skillful and prudent motorman was required to do.

This brings us to a consideration of the question of whether or not, by a proper use of the brakes alone, the car could and should have been stopped, considering the speed at which it was going, within a distance sufficient to have avoided striking the deceased. While it is true that the testimony of the two opinion witnesses of the plaintiff consisted largely of estimates, based solely upon their general experience as motormen, of the distance within which the car should and could have been stopped by the use of the brakes while going at a given rate of speed, still this testimony, having been offered and received without objection, was some evidence of the fact in dispute and the court might have considered it, and doubtless did consider it and give it some weight, when it made its findings. Further support of the finding relative to the effective use of the brakes is to be found in the testimony of the plaintiffs' witnesses Setchell and Pistonetti, who, at the time of the accident, were riding on the front of the east-bound car. Setchell testified, in substance, that he felt the impact of the car against the body of the deceased; that he could not say from the "feeling" of the car that the brakes had been set prior to the collision of the car with the deceased, and that he "felt the brakes set after the lady had been struck." The inference naturally and necessarily deducible from this testimony was that the brakes were not set at all, or, if set, were not so set as to make their operation effective until after the deceased had been struck. While it is true that the testimony of this witness in so far as it related to the *timely* application of the brakes was, as is clearly indicated by the findings, rejected by the trial court, nevertheless, it does not appear, and we cannot say, that the testimony in question, in so far as it related to the *effective* operation of the brakes, was also rejected by the trial court. The inference that the brakes, though set, were not effectively set, finds further support in the testimony of Pistonetti, who testified that "The car stopped rather gently—it didn't stop with a jerk; it slowed up and stopped rather gently." The testimony of Setchell and Pistonetti, considered in conjunction with that of the opinion witnesses, creating, as it clearly did, a conflict in the evidence concerning the proper and efficacious use of the brakes, sufficed to support the finding that the motorman of the east-bound car was negligent in not bringing his car to a stop sooner than he did.

[3]    It appears from the record that, during the argument of the case, the trial court, in the face of objection, discussed with counsel for the plaintiff and ultimately received and reviewed the evidence adduced in another case which had been tried before the same court relative to the distances within which cars of a company other than the defendant could be stopped.    This was error and was not cured by the certificate of the court that its decision was wholly based upon other and competent evidence.    (*Peck* v. *Pierce,* 63 Conn. 310, [28 Atl. 524] ; *Rapson* v. *Leighton,* 187 Mass. 432, [73 N. E. 540] ; *Jaques* v. *Bridgeport etc. Co.,* 41 Conn. 61, [19 Am. Rep. 483].)    That this error contributed to the judgment and was, therefore, prejudicial seems clear when viewed in the light of the fact that the evidence upon which rests the finding of negligence in the east-bound motorman was little better than meagre.    Our conclusion in this behalf is fortified by the fact that, when the plaintiffs and defendant had both rested their case and before the extraneous evidence complained of had been considered at all, the trial court announced, as shown by the bill of exceptions, that ''there was the gravest doubt as to whether it was possible for the motorman to have stopped his car sooner than he did.''

[4]    The trial court also erred, to the prejudice of the defendant, in its ruling, in the face of specific and sufficient objection, permitting the cross-examination by plaintiffs' counsel of plaintiffs' expert witness, Lacher.    Plainly the purpose of this cross-examination was to show that the witness was biased in favor of the defendant.    It tended to, and doubtless did, discredit the witness to the extent that his testimony was favorable to the defendant.    This the plaintiffs were not entitled to do.    If the witness in question, having been called by the plaintiffs, had unexpectedly given damaging testimony against them, it would have been permissible, under the provisions of section 2049 of the Code of Civil Procedure, to show that the witness had previously made statements inconsistent with his testimony upon the theory that the plaintiffs were taken by surprise by the adverse testimony of their own witness.    (*People* v. *Creeks,* 141 Cal. 529, [75 Pac. 101].)    Assuming that the witness in question did give testimony against the plaintiffs and conceding that counsel for the plaintiffs was, as he stated when insisting upon the right to cross-examine his own witness, surprised at the

testimony of the witness, still this fact did not give him the right to cross-examine merely for the purpose of showing bias. **[5]** The general rule is that where a witness is unexpectedly hostile to or biased against the party by whom he is called, such party cannot introduce evidence tending to show such hostility or bias. (*In re Mellen's Estate,* 56 Hun, 553, [9 N. Y. Supp. 929]; *Wise* v. *Wakefield,* 118 Cal. 107, [50 Pac. 310].)

Subsequently, counsel for the plaintiffs endeavored to impeach the testimony of this same witness by proof of previous inconsistent statements. As a foundation for the attempted impeachment, the witness in question was asked if he had not made certain statements to a man named Miller at a certain time and place. The witness having denied making the statements contained in the impeaching question, Miller was called and sworn by the plaintiffs as an impeaching witness. The record shows that the trial court, over objection, permitted Miller to be interrogated as to what he said to the witness sought to be impeached, rather than what the latter said. In short, the impeaching question, involving the claimed inconsistent statements and which, in the first instance, had been put to the witness sought to be impeached, was not propounded precisely or in substance to the impeaching witness. **[6]** "The proper method of impeachment is to formulate the question so as to embrace the very statement, at least in substance, which the witness whom it is desired to impeach has denied making, and to ask the impeaching witness for a categorical answer whether the statement was made, giving 'the circumstances of times, places, and persons present.' (Sec. 2052, Code of Civ. Proc.)" (*Norris* v. *Crandall,* 6 Cal. Unrep. 706, [65 Pac. 568, 570]. See, also, *People* v. *Nonella,* 99 Cal. 333, [33 Pac. 1097].)

This disposes of all of the points made in support of the appeal which we deem worthy of discussion.

The judgment appealed from is reversed.

Wilbur, J., and Melvin, J., concurred.