[Civ. No. 17078. First Dist., Div. One. May 15, 1957.]

PARLIER FRUIT COMPANY (a Corporation), Plaintiff and Appellant, v. FIREMAN'S FUND INSURANCE COMPANY (a Corporation) et al., Defendants and Appellants; SCOTTISH UNION AND NATIONAL INSURANCE COMPANY (a Corporation) et al., Respondents.

8

Winston Churchill Black for Plaintiff and Appellant.

Cooley, Crowley, Gaither and Godward, Castro & Huddleson for Defendants and Appellants and for Respondents.

BRAY, J.—In an action for losses under policies of fire insurance, plaintiff recovered judgment against defendant Pacific Indemnity Insurance Company for $43,279.95 with interest from November 29, 1952, against defendant Home Fire and Marine Insurance Company of California for $25,296, together with interest from the same date, and against defendant Fireman's Fund Insurance Company for $8,467.73 with like interest. All said defendants appeal. In its action for losses under claimed use and occupancy insurance coverages judgment went against plaintiff and in favor of the defendants attempted to be charged.[1] Plaintiff appeals therefrom.

---

[1] These are Planet Insurance Company, Insurance Company of North America, Boston Insurance Company, Scottish Union and National Insurance Company, Pacific Indemnity Insurance Company, and Home Fire and Marine Insurance Company.

## Questions Presented

### Defendants' Appeal

1. Sufficiency of the evidence to support the finding that Orlandella and others did not enter into a conspiracy to defraud defendants by falsely upping the value of the property, insuring it, and then causing it to be burned.

2. Alleged error in admission and exclusion of evidence.

3. Failure to find that Fite was an employee.

### Plaintiff's Appeal

1. Were coverages for loss of use and occupancy sufficiently certain to be enforceable?

2. Did plaintiff change its theory?

3. Appeal against Pacific and Home.

4. Was Home released?

5. Was Boston's liability increased?

### Defendants' Appeal

1. SUFFICIENCY OF EVIDENCE.

This litigation resulted from a fire on the night of July 31, 1952, which completely destroyed plaintiff's packing house and contents at Parlier. Defendants contend that the fire was the result of a conspiracy between Vito Orlandella, plaintiff's president, and others to cause the building to be burned.[2] Vito was one of two stockholders of Vito Fruit Company which owns a packing house in Lodi and also rents one there. That company owns and rents other packing houses. Vito also rents packing houses.

Vito and one Goldberg had a partnership doing business under the name of Parlier Fruit Company. They were going to form a corporation but Goldberg drew out. Goldberg had introduced Vito to Max Nudel. Vito hired Nudel at $60 per week to repair the packing shed of the partnership. When the corporation was formed, Vito offered Nudel $100 per week as salary during shipping season, plus 25 per cent of the net profits for 1952. Nudel was to have 25 per cent of the corporation stock to be paid for out of his share of the profits. Vito was president, Nudel vice president, of the corporation. Five hundred shares were issued to Nudel, 1,500 to Vito. After the fire Nudel paid $5,000 for his 500 shares from a loan by

---

[2]Defendant fire insurance companies do not question the court's findings that their respective policies were in force at the time of the fire nor that they exceeded the amounts awarded against them respectively, nor do they attack the sufficiency of the evidence to support the amounts awarded plaintiff.

Vito to him in that amount. Vito held a contract to purchase the packing shed which he assigned to the corporation. The day of the fire, the shed was owned by plaintiff corporation. Nudel, under Vito's control, supervised the packing operations at the plant. Nudel, who had known Fite for about 10 years, employed Fite for plaintiff to work with him in getting the packing shed ready and to handle the picking and hauling of the grapes to be packed. Vito first met Fite at the plant about a month before the fire. He told Fite that whatever Nudel had agreed with Fite was all right with him. Both Nudel and Fite had keys to the offices of the packing shed.

July 22, 23, 29 and 30, telephone calls were completed between Vito Fruit Company at Lodi and Parlier (apparently to Fite). The day of the fire (July 31) Nudel phoned Fite five or six times. Shortly before the fire started Fite attempted to reach Nudel by phone. That day, shortly before noon, Vito and Nudel arrived at Parlier. At 6:30 p.m. they went to Nudel's home, arriving about 6:45. Staying about 45 minutes, they left for Bakersfield where they arrived about 10 p.m. Nudel registered for them at the Inn. (The Inn records show this to have been between 11:15 and 11:45 p.m.) Vito went to Goldberg's room about 11 and 15 to 45 minutes later Nudel came in. About midnight Vito's brother phoned him from Lodi about the fire at Parlier. Vito and Nudel arrived at Parlier about 4:30 a.m. They found the shed completely demolished. They then drove to Fite's house. Fite told them he left the shed 15 minutes before the fire started. About 10 a.m. Vito again talked to Fite who told him that in talking to an investigator Fite had forgotten to mention seeing a young man at the shed. Vito told him to tell the investigator about it. The following day Vito talked to Fite saying that Nudel had persuaded Vito not to have the district attorney pick Fite up. Fite said "I will fix you" and then left in a huff. Vito has not seen Fite since. After the fire plaintiff corporation ceased operating. Nudel's salary was discontinued. He received $8,000 as his percentage on a deal with Vito and Goldberg. Nudel has not worked for Vito since the fire, although Vito on two occasions thereafter loaned Nudel $500.

Nudel previously worked with Fite for Goldberg at Youngstown. There was a fire there. Nudel denied saying to Fite that he, Nudel, had done a bad job in setting it. On the morning of the Parlier fire, Nudel called Fite but only talked to his wife as Fite had not returned from Oregon. He did not

contact Fite that day. On August 1 Nudel talked to Fite who said he knew what had happened. Fite stated that if he did not receive $4,000 he would fix them. Vito and Nudel informed the district attorney of this conversation.

Fite arrived home from Oregon, where he had been on personal business for over a week, between 7 and 7:30 p.m. He went to Parlier to make some business calls. He did not know whether he turned on the light in the office while phoning. He tried unsuccessfully to contact Nudel. He went to the west end of the shed to look at some machinery, but did not turn on any lights. On leaving Parlier for home he met a young man in the shed who said that he was looking for an athletic coach of Reedley. Fite left the shed about 8 p.m. Shortly after arriving home he heard the fire alarm and saw a blaze in the shed's direction. He got in his car, drove by the shed, did not stop, but returned home. From there he called Nudel's home and was told he was in Bakersfield. He called the Inn there and kept his call until midnight. He talked to Goldberg who told him he had not seen Nudel for several days. He told him to try Lodi. Fite reached Vito's brother in Lodi and told him of the fire. Fite did not recall in which conversation he told Vito about the young man at the shed. Fite talked to Nudel that evening and told him that he, Nudel, was not where he was supposed to have been the previous night. He also told Nudel that he felt Nudel had doublecrossed him and that he was not going to get by with it. He denied asking for $4,000. Nudel told him to keep his mouth shut and Vito would make things right with him. At a conversation with Vito the latter told him that if he did not keep quiet, the district attorney would be sent for him. Two days later Nudel phoned Fite saying Vito would do as he said if Fite did not shut up.

At Nudel's suggestion no lights were on the shed the night of the fire, although prior thereto one or two small lights had been kept lighted. There had been some paint thinner used in the shed but Fite could not say whether there was any in there the night of the fire.

One Galloway was the young man encountered by Fite in the shed. He heard a telephone ringing in the office before Fite came out. He saw nothing to indicate that there would be a fire. The fire occurred about an hour afterward.

One Doi, while standing across the street, saw a fire burning about floor level of the shed. Five to 10 seconds later he noticed it was burning close to the ceiling. In a short period everything was burned down.

One Scroggins saw the fire. It was in a pile of boxes in the center of the shed about midway to the ceiling. He ran into his house to tell his parents. When he came out in about five seconds the fire had spread to practically the whole shed.

One Alfors came out of his house after the second blast of the fire siren. He saw the fire start at the northwest area midway between the floor and the eaves. In a short while the entire structure was on fire.

The chief of police said he first saw the fire in the northwest corner about two minutes after he heard the fire signal. Then it gushed out of the east end to a height of 25 feet with black smoke. It looked to him like someone had set the shed on fire. There was no wind that night.

When the fire chief arrived the shed was completely enveloped in flames. He examined the debris the day after the fire. He found a gasoline can, but could not determine its contents. Gasoline was not kept on the premises. The can was in the northwest corner of the premises where he stated there was the most intense area of heat. He could not account for the heat being more intense here. A fire originated under the double floor of the shed, and in his opinion was an incendiary fire. His opinion was based (1) on the fact that there were apparently three independent origins of fire,[3] (2) evidence that a volatile petroleum liquid was involved, (3) the absence of any basis for accidental origin or source of acceleration, and (4) the unnatural and unusual rapidity of the spread of the fire.

One Wolfe who had been fire chief of a Navy base and who had been in the Arson Bureau of the Los Angeles Fire Department for over 10 years was of the opinion that there was nothing to indicate incendiarism. He testified that the rapid spread of the fire was attributable to the type of structure (open on the sides, covered with a metallic roof which he stated would cause a fire to spread more rapidly than in an enclosed building) and to the many lug boxes and the excelsior packing materials.

Six months before the fire Vito had bought the building for $12,500, one half of which had been paid at the time of the fire. Vito assigned his rights under the purchase contract to plaintiff. Three thousand five hundred ten dollars and ten cents had been spent in improvements. The value of the

---

[3]Defendants' expert, the fire chief, gave as his opinion that there was a third place of the start of the fire, namely, under the floor. None of the witnesses who saw the fire saw any fire there in the beginning.

shed on plaintiff's books was $16,010.30, the same figure shown as loss on plaintiff's tax returns. Plaintiff had authorized Vito to obtain fire insurance on the shed in the sum of $60,000. This was done. Neither Vito, Fite nor Nudel knew how the fire started.

Defendants contend that Vito had a motive for burning down the packing shed, namely, the recovery of insurance for property worth less than the insured value. As against this, the evidence (defendants offered none to the contrary, although they claimed that the equipment had been moved out and was not in the shed at the time of the fire, a matter heretofore discussed) showed that Vito's reasonably expected profits from the operation of the packing house would far exceed any possible gain from the fire. Likewise Nudel had more to gain financially from the operation of the plant than from a fire.

The court found that Vito had not entered into a conspiracy to defraud the insurers, or caused the building and its contents to be burned. It then gave judgment against Pacific Indemnity for $43,279.95 under a fire policy on the shed of $45,000, and against Home Fire for $14,426.65 under a similar policy of $15,000;[4] for $5,654.72 under an endorsement covering box shook and packing materials of $10,000; for $5,214.63 under an endorsement covering equipment for $11,200; and against Fireman's Fund for $8,467.73 under a policy of $12,000 covering lug boxes.

We cannot say as a matter of law that the foregoing evidence proves a conspiracy upon the part of Vito together with Nudel and Fite to burn down the shed, nor even that it was burned by an incendiary.

2. ADMISSION AND EXCLUSION OF EVIDENCE. (a) Paul Wolfe.

He was the expert called by plaintiff who testified that in his opinion the fire was not of incendiary origin. Defendants contend that Wolfe's opinions were inadmissible because not based upon all the essential facts. Hypothetical questions which omit material undisputed evidence essential to a fair opinion by an expert are improper. (*Lawrence* v. *Butler*, 79 Cal.App. 436 [249 P. 840].) Plaintiff's questions assumed a rapid spread of the fire. The two elements which defendants contend were omitted from the evidence were (1) presence of inflammable liquids and (2) two or more different places without communication between them. We doubt that

---

[4]The court found the actual value of the building at the time of its destruction to be $57,706.60.

the evidence compels the conclusion that either of these elements were present. Whether the 25-foot flame and black smoke coming through the roof, considering the roofing, conveyor belts and other materials in the building, proves that there were inflammable liquids upon the premises, was a matter for the determination of the trial court. The same is true as to the question of the fire starting in more than one place. The viewpoint of the various witnesses was different and they could have been seeing the same fire from a different angle. For example, Doi first thought the fire was across the street from the shed. No witness testified to seeing two fires at the same time. Most of Wolfe's testimony was on the question of how particular materials would burn and was based upon the photographs of the progress of the fire taken by the witness Alfors. Defendants contend that his testimony that the fire shown therein under the floor could have started on top is based upon his assumption that there was a single floor. Wolfe saw the photographs which were taken of the fire as it progressed. The evidence is not clear as to whether the witness knew or did not know of the double floor. Defendants' only objection to questions asking Wolfe's opinion as to the nature of the fire was that no foundation was laid for the question. At no time did defendants complain that any question omitted any claimed necessary fact or that the witness did not have before him any necessary fact. Defendants should have pointed out the specific defects, if any, so that the court could have ruled upon them. (*Howland* v. *Oakland C. St. Ry Co.*, 110 Cal. 513 [42 P. 983].) If an objection is that the question omits essential facts, those facts should have been pointed out in the objection. (*Dameron* v. *Ansbro*, 39 Cal.App. 289 [178 P. 874].)

(b) Denial of Cross-Examination of Fite.

Defendants contend that they were entitled to cross-examine Fite under Code of Civil Procedure section 2055 because he was an employee of plaintiff. The court sustained plaintiff's objections to some of the questions asked by defendants of Fite under cross-examination under section 2055, Code of Civil Procedure, apparently upon the ground that Fite's testimony showed that he was favorable and not hostile to defendants. Section 2055[5] provides that an employee of an

[5]Prior to 1951 this section permitted only the cross-examination of an adverse party, his directors, officers, superintendent or managing agent. In that year the section was amended to include ''member, agent, employee.''

adverse party may be examined as if under cross-examination. Whether this section may be applied to the examination of an employee of an adverse party who shows himself, as did Fite here at times, favorable to the party examining him, has not been determined in California. Apparently in other jurisdictions it has been held that under similar statutes an employee of an adverse party who is not hostile to the party examining him may not be cross-examined. (See 38 A.L.R. 2d 952, 954; III Wigmore on Evidence, 3d ed., § 773, p. 131.) We deem it unnecessary to determine that question here for two reasons: First, while at times Fite evidently was testifying adversely to his former employer, his attitude was not consistent and at times he appeared hostile towards the defendants. Secondly, for all practical purposes the testimony sought to be obtained by the questions to which objections were sustained, was actually adduced during other portions of Fite's testimony. There is one exception to this. Nudel had been asked by defendants if he had not told Fite that he, Nudel, had set fire to the Youngstown packing house. Nudel denied making such statement. Defendants, using the exact words of the question asked of Nudel, asked Fite if Nudel had not made such statement. The court sustained an objection to this as ''leading.'' ■ It was a proper way of impeaching Nudel and hence the court erred in sustaining the objection. (*McLaughlin* v. *Los Angeles Ry. Corp.*, 180 Cal. 527 [182 P. 44].) However, the error was not prejudicial as a reading of the record shows that the court could not help but know that defendants were contending that Fite claimed that Nudel had informed him that he had set such a fire and that because of the many contradictions in Fite's testimony, his apparent bias against Nudel and Vito and all the circumstances of the case, the court would not have believed Fite had he testified that Nudel did make such statement.

3. FAILURE TO FIND THAT FITE WAS AN EMPLOYEE.

■ The court made no finding on this subject other than that no infidelity of an employee caused the loss. Fite had been an employee of plaintiff's prior to his leaving for Oregon a week or ten days before the fire. There was evidence from which it could be concluded that his employment then terminated and that he was now waiting for the plant to be started in operation when he would be an independent contractor for labor and hauling. Also the evidence would have supported a finding that he was still an employee. The finding made is subject to three interpretations, any one of which is supported

by substantial evidence: (1) That Fite neither was an employee nor set the fire. (2) That Fite was an employee but did not set the fire. (3) That Fite was not an employee but did set the fire. In view of the court's finding that there was no conspiracy between Vito and Fite, under none of the possible interpretations would such finding be a defense. Nor if the court were to make a direct finding that Fite was an employee would defendants be entitled to a judgment. This action was based upon a complaint alleging that Vito conspired with Nudel and Fite to cause the fire. The court expressly found, and the evidence supports the finding, that this allegation was not true.

*Plaintiff's Appeal.* Coverages.

In 1952 John Babish was a licensed solicitor employed by William Rebholtz, doing business as J. S. Montgomery Company, a general agent for all the defendants in this cause of action, and as such authorized to issue binders and cover notes on said companies. He had worked for Rebholtz for 27 months during which he handled all of Vito's insurance, the latter having been assigned to him because Rebholtz was ill. Babish was authorized to represent Rebholtz and on his behalf to issue binders and cover notes for plaintiff on behalf of defendants. About two months before the fire, Babish spoke to Vito about use and occupancy insurance. July 22 Babish told Vito that he had no knowledge of the requirements of the insurance companies for this type of coverage but that he would bind Vito until a representative arrived to determine the best insurance for the type of business. One hundred thousand dollars was the amount agreed upon. Babish returned to his office and told the secretary to write defendant Planet for $100,000 coverage binder to await a special agent's visit to Lodi to work out the best form of use and occupancy for the insured. Planet wired Babish "must request reduce binder immediately to not exceeding $7,500" and endorsed on Babish's letter to it and their "daily," "Bound for $7,500.00." Babish then wrote to the other defendants requesting coverage from each which would aggregate $75,000, pending a visit from a special agent to work out the best form.[6] Babish told

---

[6] $7,500 coverage by defendant Planet Insurance Company, $10,000 by defendant Scottish Union and National Insurance; $15,000 by defendant Pacific Indemnity; $10,000 by defendant Home Fire and Marine; $12,500 by Boston, and $10,000 by Insurance Company of North America. Babish later requested Boston to increase its binding coverage to $22,500.

Vito that plaintiff was covered for use and occupancy for $75,000 and Vito stated that was sufficient. No writing of any kind was given Vito or plaintff, nor was any writing received by Babish before the fire from any of the defendants other than Planet, indicating acceptance of coverage. Prior to the fire Pacific National Fire Insurance Company (not a defendant here) telephoned Babish's office that it would not accept coverage, Babish having theretofore requested coverage in the sum of $10,000. August 4 (after the fire) Boston wrote Babish that it could not accept the additional $10,000 binding coverage requested. July 31 (the day of the fire) Home left a message at Babish's office that it could not accept the coverage requested. Babish received this notice August 1. July 29 defendant Insurance Company of North America wrote Babish that it held $10,000 binding coverage for loss of use and occupancy to plaintiff. August 1 defendant Scottish Union and National Insurance Company in a letter to Babish stated that it had checked its correspondence and found that it was bound to plaintiff for $10,000 on use and occupancy pending a decision as to which form of policy would be issued.

The court found the foregoing facts to be true and that plaintiff would have made a profit of $70,675 from the use and occupancy of the building had it not been destroyed. Thus the court found that Rebholtz had authority to bind the defendants to plaintiff for binder coverages for use and occupancy in the amounts which Babish had requested coverage from defendants respectively, except that the court found that Home Fire and Marine's coverage was cancelled by its notice to Babish's office on July 31 prior to the fire and that Babish's attempt on July 30 to increase the Boston coverage from $12,500 to $22,500 was not effective. The court, however, gave judgment for defendants on the sole ground that the binding coverages were each "too uncertain and indefinite as to the amount of insurance, type of insurance to be issued or the terms thereof, and premium to be paid, to be enforceable; and that it is essential for a binding coverage to be enforceable that the terms of the policy to be selected be agreed upon when the binder is issued."

### 1. WAS THE COVERAGE INDEFINITE AND UNCERTAIN?

In connection with the court's finding that Rebholtz had authority to bind defendants by an oral coverage and that Babish was authorized to represent both Rebholtz and

defendants in this respect, defendants contend that Babish had no authority to bind them, claiming that he was merely a solicitor and not their agent, and that a solicitor may not bind an insurance company. (See *Browne* v. *Commercial Union Assur. Co.*, 30 Cal.App. 547, 554 [158 P. 765].) This contention overlooks the fact that Rebholtz was the general agent of defendants with full power to bind them, and that Babish was the representative of Rebholtz authorized to act for Rebholtz. Moreover, the defendants acknowledged Babish's right to act for Rebholtz when they respectively answered his request for coverage by agreeing to the coverages above mentioned.

The most serious question is whether because the exact terms of the insurance to be issued under the coverages were not agreed upon the coverages were too uncertain and indefinite to be enforced. ▮ ''It is now settled law that insurance companies may enter into binding parol contracts to issue new policies, to renew existing policies or to transfer existing insurance from one location to another. . . . The reason underlying the decisions is graphically expressed in *Eames* v. *Home Ins. Co.*, 94 U.S. 621, 627 [24 L.Ed. 298], where the court said: 'If parties could not be made secure until all the formal documents were executed and delivered, especially where the insuring company is situated in a different state, the beneficial effect of this benign contract of insurance would often be defeated and rendered unavailable. As said by Mr. Justice Field, in the case of *Franklin Fire Ins. Co.* v. *Colt*, 20 Wall.(U.S.) 560, 567 [22 L.Ed 423, 425], ''It would be impracticable'' (for a company) ''to carry on its business in other cities and states, or at least the business would be attended with great embarrassment and inconvenience, if such preliminary arrangements required for their validity and efficacy the formalities essential to the executed contract. . . . If no preliminary contract would be valid unless it specified minutely the terms to be contained in the policy to be issued, no such contract could ever be made or would ever be of any use. The very reason for sustaining such contracts is, that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted.'' ' '' (*Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co.*, 177 F.2d 305, 308.)

''For the sake of convenience, contracts of insurance sometimes exist in two forms: (1) A preliminary contract intended to protect the applicant pending investigation of the

risk by the company or until the policy can be properly issued. (2) The final contract or policy itself. This preliminary contract is of the greatest importance, for if the applicant could not be made secure until all the formal documents were executed and delivered, the beneficial effect of the insurance system would be greatly impaired. . . . An agent possessing authority to bind the company by contracts of insurance has authority to bind it by a preliminary or temporary contract of insurance. . . ." (44 C.J.S. 957.) This preliminary contract is sometimes called "cover note" or "binder." "To be binding as a contract of insurance, a preliminary contract must be one for present insurance and not merely an agreement to insure at some future time. . . . A preliminary contract of insurance is necessarily of the most informal character, for it would be impracticable for a company to carry on its business at a distance if such preliminary arrangements required for their validity and efficacy the formalities required for the executed contract. . . . A valid temporary or preliminary contract of present insurance may be made orally, or it may be partly in parol and partly in writing. . . . Even where such express language is not employed, the contract is construed as being subject to the terms and conditions of the policy to be issued or of the policy ordinarily used by the company, or, if there is a standard policy in the jurisdiction, according to the terms and conditions of that policy, and it is presumed that the parties contemplated such a policy, containing such conditions and limitations. . . . The intention of the parties is the fundamental issue in interpreting a binding receipt issued by insurer at the time of the application for the policy, and where such a receipt is clearly established as a temporary contract of insurance it is favorably regarded by the courts. . . . It is a common practice pending delivery of a policy to issue to the person contracting for fire insurance some sort of a receipt or memorandum which is sometimes called a 'binding slip,' evidencing the making of the contract, and such memorandum is evidence of a present contract of insurance, affording temporary protection to the applicant pending the issuance of a policy, or consideration of the application and its acceptance or rejection." (44 C.J.S. 958, 959, 960, 964.)

With these rules of construction in mind, let us examine the contract here. It is clear that Babish, certain of the defendants and Vito believed that plaintiff was temporarily covered by use and occupancy insurance until the exact terms

of a policy could be worked out. Certainly those defendants knew what they had in mind when they considered themselves bound for a particular sum for use and occupancy insurance. No one concerned doubted that the coverage had taken immediate effect. Had there been no fire, plaintiff would have had to pay defendants for premiums for that coverage in the event that no policy was ultimately issued. If issued, the premiums would have related back to the date when Babish told Vito plaintiff was covered. ■ The policy must be "specific, either by express terms or implication, as to the subject matter, period, rate, and amount of insurance." (44 C.J.S. 963.)

*Subject matter.* It was use and occupancy insurance on plaintiff's packing shed operation at Parlier. ■ Defendants contend that there are five types of use and occupancy insurance, and therefore the subject matter was indefinite as neither Vito nor Babish knew of the best type available to plaintiff. But such fact did not invalidate the oral binder. The accepting defendants must have known the type when they accepted Babish's request for coverage. It necessarily would be the type and form usually issued to an insured in the same type and class of business as plaintiff. ■ "Where, however, the preliminary oral contract or binding slip does not specify the terms and conditions, it is a general rule that the parties will be presumed to have contemplated a form of policy containing such conditions and limitations as are usual in such cases," (44 C.J.S. 965) not the highest form of coverage which could be obtained but one reasonably suited to plaintiff's situation. To hold otherwise would mean that parol binders although recognized by law to be valid, are only valid if the insurance company wants to consider them so. Thus, when the permanent policy is issued and the insured charged a premium for the period covered in the binder, a fraud would be consummated, as the insured would be charged the back premium, even though he really had no protection during the period charged for.

■ An exhibit in the case is "Business Interruption Form No. 8," a form of use and occupancy insurance. This form contains a blank for insertion of the length of time of suspension for which loss may be claimed which shall not exceed the per cent inserted in the contribution clause which is likewise in blank. Thus this percentage was a matter still to be agreed upon at the time the policy would be issued. Defendants contend, in effect, that although plaintiff, Babish and the accepting defendants all considered plaintiff to have been covered

for use and occupancy insurance, plaintiff could not be so covered because this percentage had not been agreed upon. However, this term or condition is one which it is presumed the parties contemplated to be a reasonable percentage as applied to the plaintiff's business operation. To hold otherwise would be to disregard said defendants' own acts in considering themselves bound to plaintiff to the extent they agreed with Babish to be bound.

The letter written August 1 (after the fire) by Scottish to Babish shows the proper interpretation as to terms of the coverage. After stating that Scottish was bound for $10,000 on "U. and O." it stated that there should be cooperation among the various companies as to what form the policy should be written on. The same is true of North America's letter of July 29th. It showed that it considered itself bound in the amount of $10,000, business interruption coverage, and then interpreted the binder as requiring "the ultimate Use of Occupancy form best suited and applicable to this risk . . ." It further asked Babish when he desired North America "to put this coverage on a permanent basis, kindly signify the type of form your office desires."

Planet in its letter to Babish of July 24 requested him to inform it if Babish had exercised the authorization given to "reduce our binder to not exceeding $7,500" and further set forth: "The information we developed on this risk" describing plaintiff's building and contents.

Thus the accepting insurance companies themselves did not consider the binder as being indefinite, but interpreted it as requiring the policy form best suited applicable to plaintiff's business.

*Period.* Obviously the period here was the time between the making of the oral binder agreement and the time when the policy would be agreed upon and received, or rejected. (44 C.J.S. 964, *supra.*)

*Rate.* The premium rate would necessarily be the company's rate for the coverage received. There is implied an agreement to pay the usual premium. (44 C.J.S. 959.) See *Globe & Rutgers Fire Ins. Co.* v. *Liberty Bell Ins. Co.,* 16 Cal. App.2d 76 [60 P.2d 200]; "The law seems to be well settled that a 'binder' contract or 'keep covered' contract need not express any consideration, there being an implied agreement to pay the usual premium." (P. 79.)

*Amount of insurance.* Here, plaintiff expressly agreed to accept a total insurance amount up to $75,000 and impliedly agreed to accept from each company the amount allocated to

it by Babish, provided only that the total from all companies did not exceed $75,000. Each defendant agreed to coverage in a particular sum. All the elements required to make a binding contract were present.

While fire insurance policies are generally in standard form and differ from the situation in use and occupancy policies, the principle enunciated in *Shumway* v. *Home Fire & Marine Ins. Co. of Calif.* (1938) 301 Mass. 391 [17 N.E.2d 212], dealing with fire insurance coverage, is somewhat in point. There the plaintiff told the defendant's agent to cover for $4,000 a house he had just bought. The agent told him he was covered. The building was burned about a week later and before a policy was issued. The court held that a binding oral preliminary agreement of insurance had been entered into. The defendant contended the agreement was indefinite as neither the plaintiff nor the agent knew what the premium rate was to be, and the agent did not know how to describe the building. In holding the agreement to be a valid one, the court said "An oral agreement for insurance is not rendered invalid because more information must be had before a policy can be written." (P. 214.)

In *Bankers Indem. Ins. Co.* v. *Pinkerton*, 89 F.2d 194, the court found that there was an oral coverage for public liability insurance, although the agent denied that there was. The court held further that it is not essential to the oral contract of insurance that "every detail should be agreed upon, but that an implied agreement concerning essentials is as good as an express agreement, and where no express agreement was reached as to the term risk the parol contract will not be invalid for uncertainty in that particular if the parties' intent as to its duration can be gathered from the facts and circumstances in evidence." (P. 197.)

A somewhat similar situation to ours existed in *Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co., supra,* 177 F.2d 305. There one Collins was the common agent of three insurance companies, Lumbermen, Firemen and Citizens. Collins had solicited Slide Rule for fire insurance on inventories. Slide Rule had not determined the amount or type of policy. Collins suggested a monthly reporting type. Slide Rule said it would consider the matter and advise Collins of the definite amount of coverage. Collins said he would cover the risk as soon as advised by Slide Rule. The latter wrote Collins stating it desired $75,000 insurance on monthly basis type suggested by Collins and asked that the insurance be

made effective at once. Collins immediately took steps to place such insurance with the three companies. He did not advise Slide Rule the names of the companies with which he had placed the insurance. ''The evidence clearly disclosed an intention upon the part of Collins to bind each of the companies when and as they were designated by him.'' (P. 307.) (The same thing is true as to the intention of Babish in our case.) The court held that the insurance companies were bound by its agent's acts. As to the contention that the parties' minds did not meet upon the names of the companies to be bound (the same contention is made in our case) the court said (p. 309): ''When the agent represents several companies and selects certain of them to be bound by the risk, he is contracting for undisclosed principals. Each of the companies he represents has intrusted him with the agency, and must be held to have given him authority as such agent to select it as the one to bear the risk. Such authority springs inevitably from his authority to make insurance contracts. The insured can not be permitted to suffer because the agent fails to disclose at the time of making the contract which of several principals he binds.''[7]

Concerning the fact that, as in our case, the parol contract was to be followed by certain policies, the court said that that fact did not make the contract any less binding or effective. The court quoted from *Cottingham* v. *National Mutual Church Ins. Co.*, 290 Ill. 26 [124 N.E. 822, 825] (p. 310): '' '. . . It is sufficient if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the period, the amount and the rate of insurance are ascertained or understood, and the premium paid, if demanded. . .' ''

In *American Can Co.* v. *Agricultural Ins. Co.* (1909), 12 Cal.App. 133 [106 P. 720], in which the facts are entirely different from those in our case, including the fact that no binder was made, the court said (p. 135): ''A parol contract of insurance may be made and is enforceable; but as such contracts are rarely made, and are not made in the usual and ordinary course of business, the proof of such oral contract must be clear and convincing.'' *Law* v. *Northern Assurance Co.* (1913), 165 Cal. 394, 400-401 [132 P. 590], is to the

---

[7]*Kleis* v. *Niagara Fire Ins. Co.* (1898), 117 Mich. 469 [76 N.W. 155], and *Kitchen* v. *Yorkshire Ins. Co.* (1924), 226 Ky. 376 [10 S.W.2d 1074], seem to hold to the contrary. It appears to us that the Slide Rule case, *supra,* is better reasoned and more realistic of the present methods of insurance business.

same effect. While it may have been true that in 1909 and 1913, parol contracts of insurance were rarely made, such statement is no longer true. Oral binders are now a common and necessary part of the insurance business. The evidence here is clear and convincing as there is no contradiction of the testimony of Vito and Babish upon the subject of the coverage. *Gandelman* v. *Mercantile Ins. Co. of America,* 187 F.2d 654, is not in point as the court held that the alleged agent of the insurance company had no authority to bind the companies. The court stated that at the time the agent told the plaintiff "You are covered" he was "not acting specifically in behalf of appellees here and his answer obviously did not purport to bind these appellees. . . ." (P. 656.) *Western Indem. Co.* v. *Industrial Acc. Com.,* 182 Cal. 709 [190 P. 27], is not in point for the reason that it was held that there was no evidence showing that the agent of the insurance company had authority to bind it by parol. The same is true of *Cranston* v. *California Ins. Co.* (1919), 94 Ore. 369 [185 P. 292].

▌ The court found that on July 22nd Babish on behalf of Rebholtz "agreed with plaintiff to place an immediate binding coverage" for a maximum of $100,000 and on July 24, upon instructions of plaintiff "agreed to place binding coverage at the reduced maximum of $75,000.00 . . ." Defendants contend that the omission of the word "immediate" in the finding as to July 24, was in effect a finding that at some indefinite time in the future Babish would obtain the coverage. Taking the finding with the evidence, and the fact that Babish did immediately place the coverage with defendants, plus the fact that the court found a "binding coverage" except for its claimed indefiniteness, there can be no question that the lack of the word "immediate" is unimportant.

2. THEORY.

▌ Plaintiff alleged that each of the defendants agreed in writing to bind coverage on use and occupancy insurance in the amounts specified. Defendants contend plaintiff has changed its theory from agreements in writing to oral agreements. Plaintiff contends that the letters of the defendants, the entries in the "dailies" of three of the defendants and the entries in Rebholtz's record, constitute the agreements in writing referred to in the complaint. ▌ "A valid temporary or preliminary contract of present insurance may be made orally, or it may be partly in parol and partly in

writing, or . . . it may be, and frequently is, evidenced by a binder or binding slip, a covering note, *a binding receipt, a binding memorandum entered on the books of the agent,* or other memoranda.'' (44 C.J.S. 959; emphasis added.)

Whether plaintiff is correct in this respect is unimportant. Throughout, the case was tried upon the theory that these writings combined with Babish's oral coverage on behalf of defendants constituted the agreements upon which plaintiff was relying. If necessary as a matter of pleading the complaint could be amended to conform to the proof. Defendants were fully aware of the issues upon which the case was being tried and defended upon those issues.

### 3. APPEALS AGAINST PACIFIC AND HOME.[8]

A most unusual situation developed upon this appeal concerning defendants Pacific and Home. The findings of fact and conclusions of law found that all defendants charged for use and occupancy insurance should have judgment against plaintiff. In the judgment, however, Pacific and Home were not mentioned. Plaintiff's notice of appeal, evidently following the language of the judgment, was directed to the attorneys for these defendants omitting Pacific and Home and stated that plaintiff appealed from that portion of the judgment in favor of the named defendants, again omitting Pacific and Home. On this appeal, the attorneys who had represented all the defendants, including Pacific and Home, in the trial court filed briefs on behalf of all defendants except Pacific and Home. However, they devoted about four pages of their brief to the claim that this appeal could not affect the rights of Pacific and Home. Obviously the failure to include these two defendants in the judgment and in the subsequent notice of appeal were inadvertent clerical errors. On January 17, 1957, pursuant to motion alleging such clerical error in the judgment, an order amending judgment was entered by the trial court which included Pacific and Home in the judgment against plaintiff. This order was entered *nunc pro tunc* as of the date of the original judgment. Plaintiff then filed notice of appeal to include in its appeal the portion of the judgment as amended in favor of said Pacific and Home. On oral argument the record was augmented to include these subsequent proceedings, so that the judgment in favor of Pacific and Home as well as all other defendants is properly before us.

---

[8] It will be noted that plaintiff recovered judgment against both Home and Pacific for fire insurance. We are dealing here with the question of their liability for use and occupancy insurance only.

### 4. WAS HOME RELEASED?

█ Additional to the defenses heretofore discussed, Home claims that it had released itself from any coverage to plaintiff. On July 31st, about 9:30 a.m. (the fire occurred that night) Parry, a special agent for Home, left a note on Babish's desk (he was away from the office all that day) declining to cover plaintiff for use and occupancy. Babish did not personally receive the note until August 1st. The trial court found, in effect, that this note constituted an additional reason why Home was not bound. As we have heretofore shown, Home was bound. Therefore, the question is whether the notice to the agent's office uncommunicated to plaintiff released the insurance company from its binder. *Lumbermen's Mut. Ins. Co.* v. *Slide Rule & Scale Eng. Co., supra,* 177 F.2d 305, holds that where there is a binding parol contract to issue a policy of insurance notice to the agent of withdrawal by the company is ineffective until communicated to the insured, so as to give the insured an opportunity of getting the insurance elsewhere. Cases like *Lucas* v. *Metropolitan Life Ins. Co.,* 14 Cal.App.2d 676 [58 P.2d 934], holding that where an application for insurance is made, silence or delay by the company in acting on it does not result in a contract, nor does the rejection of the application by the company have to be communicated to the applicant, are not in point. Here Babish had authority to, and did, bind the company. To withdraw from such binder the insured must be notified. This not having been done before the fire, the company was bound.

### 5. BOSTON'S INCREASED COVERAGE.

█ The day before the fire Babish in a letter instructed Boston to increase its binding coverage of $12,500 to $22,500. This was due to the fact that Pacific stated it did not want the risk requested by Babish. August 4th, Boston notified Babish that it could not accept the additional $10,000. This, of course, was after the fire. The evidence disclosed no limitation on Rebholtz's authority as agent of Boston to bind it by a coverage. The same authority which he had to bind Boston for $10,000, which authority Boston fully recognized, authorized him to bind it in the increased amount.

Judgment in favor of plaintiff on the fire insurance policies and against Pacific, Home and Fireman's Fund is affirmed. Judgment against plaintiff on the use and occupancy binder

coverages is reversed as to Pacific Indemnity, Planet, North American, Boston, Scottish and Home.

Peters, P. J., and Wood (Fred B.), J., concurred.

On May 20, 1957, the opinion and judgment were modified to read as printed above. A petition for a rehearing was denied June 19, 1957, and the petition of defendants and appellants and of respondent for a hearing by the Supreme Court was denied July 10, 1957. McComb, J., was of the opinion that the petition should be granted.