Barbara PORCH, on behalf of herself
and others similarly situated,
Respondent,

v.

GENERAL MOTORS ACCEPTANCE
CORPORATION, Appellant,

MIC Property & Casualty Insurance
Corporation, Defendant.

Nos. CX–01–1087, C1–01–1415.

Court of Appeals of Minnesota.

April 23, 2002.

Ronald S. Goldser, J. Gordon Rudd, Jr., David Cialkowski, Zimmerman Reed, P.L.L.P., Minneapolis, for respondent.

James S. Simonson, Gray, Plant, Mooty, Mooty Bennett, P.A., Minneapolis, Jan T. Chilton, pro hac vice, Severson & Werson, A Professional Corporation, San Francisco, CA, for appellant.

Considered and decided by HANSON, Presiding Judge, SCHUMACHER, Judge, and HALBROOKS, Judge.

## OPINION

SAM HANSON, Judge.

This class action lawsuit was brought on behalf of borrowers who purchased cars under installment contracts that required

them to keep the cars continuously insured and, if they failed to do so, authorized the creditor to buy "physical damage insurance" and to charge each borrower for the "cost of the insurance." On appeal from orders determining that the coverage obtained and the premium charged were not authorized by the installment contracts, and enjoining the collection of a portion of the premium, appellant creditor argues among other things that the district court erred in concluding that the coverage obtained or the premium charged was in breach of the installment contract or was a violation of the consumer fraud act. Because we conclude that the coverage obtained and the premium charged were authorized by the installment contract, we reverse with directions to enter judgment dismissing the class action.

### FACTS

On January 13, 1992, respondent Barbara Porch bought a 1987 Cadillac Seville on credit and signed a motor vehicle retail-installment contract with Thomas Chevrolet. Thomas Chevrolet assigned this contract to appellant General Motors Acceptance Corporation (GMAC), which became the creditor. The installment contract required Porch to maintain continuous physical damage insurance on the car. It provided that:

At any time during the term of this contract, if you do not have *physical damage insurance* which covers both the interest of you and the Creditor in the vehicle, then the Creditor may buy it for you.

(Emphasis added.)

Porch breached the contract by failing to keep her car insured. When this came to the attention of GMAC, GMAC purchased collateral-protection insurance through a program it had established with MIC Property and Casualty Insurance Corporation (MIC), a duly-licensed Michigan insurance company which is a second-tier subsidiary of GMAC. Under that program, MIC provided a single master insurance policy to GMAC, which obligated MIC to insure all cars identified in collateral-protection certificates issued to borrowers who had allowed their private insurance to lapse. That master policy and the standard form of the collateral-protection certificates are on file with the appropriate insurance regulatory bodies in all states where MIC issues collateral-protection certificates.

On January 31, 1993, MIC issued a collateral-protection certificate that provided collision and specified-perils coverage for Porch's car, for the coverage period of December 5, 1992 (the date Porch's insurance lapsed) until January 15, 1995 (the date of the last scheduled payment under the installment contract).

The installment purchase agreement authorizes GMAC to charge the borrower for collateral-protection insurance as follows:

The charge will consist of the *cost of the insurance* and a finance charge, at the highest lawful contract rate. You agree to pay the charge in equal installments along with the payments shown on the payment schedule.

(Emphasis added.) MIC charged a premium of $1,396 to GMAC for the Porch certificate. GMAC notified Porch that it had purchased the insurance and that it was adding the premium, together with interest of $114.18, to Porch's installment contract balance, to be reflected in increased monthly payments.

The premium that MIC charged GMAC, and that GMAC included in the balance due from Porch, was calculated from the rate schedules of MIC that are on file with the Minnesota Commissioner of Insurance and the appropriate insurance regulatory

bodies in every other state where MIC issues collateral-protection certificates. Those rate schedules reflect the forecasted costs to be incurred by MIC to provide the insurance, divided into four components: (1) losses (what will actually be paid out in claims); (2) expenses incurred to settle claims; (3) operating and administrative expenses; and (4) profit and contingencies. The operating and administrative expenses reflected in the premium include the costs incurred by MIC to track borrowers' accounts for GMAC to determine when a borrower's private insurance has lapsed and to notify and warn borrowers about the lapsed insurance, and the costs incurred by GMAC branch offices, and reimbursed by MIC, for customer services the branch offices provide in connection with the notification and warning process.

The process of tracking, notifying and warning borrowers of lapsed insurance produces an inevitable lag between the time that the borrower's private insurance lapses and the collateral-protection certificate is issued. To avoid loss to GMAC during that lag period, MIC provides collateral-protection coverage with a "day-one coverage" feature, which means that MIC is obligated to make the coverage effective on the date the borrower's private insurance lapses, even though the lapse is not discovered and the collateral-protection certificate is not issued until a later date.

Porch brought this class action on behalf of all borrowers who purchased cars under identical installment contracts, whose contracts were assigned to GMAC, who breached their contracts by failing to keep their cars continuously insured, and who were charged by GMAC for collateral-protection insurance. Porch alleged that the insurance obtained by GMAC included coverages that were of no benefit to the borrowers and that the charge for the insurance was excessive.

The district court certified a plaintiff class of Minnesota customers to whose accounts GMAC had charged collateral-protection premiums. Prior to trial, all counts of the complaint were dismissed except two: (1) breach of contract and (2) violation of the Minnesota Consumer Fraud Act. Just before trial, the district court also dismissed Porch's claim for damages because Porch could not prove that class members had actually paid amounts in excess of those allegedly authorized by their contracts. The court struck the jury demand and ordered the case to a bench trial on Porch's claim for injunctive relief only.

The trial proceeded in an unusual manner. Porch called no witnesses, but instead relied on transcripts of depositions and on documentary evidence. GMAC presented the testimony of five expert and fact witnesses, essentially explaining the collateral-protection insurance program. In fact, the district court specifically found that

> [w]ith a series of knowledgeable and experienced witnesses, GMAC and MIC have demonstrated that their [collateral-protection insurance] program is reasonable, extensively regulated, and in accord with applicable actuarial principles.

But the district court also found that the "day-one coverage" feature of the MIC insurance provided broader coverage and produced a greater premium than were authorized by the installment contracts. The district court determined that the charge for this "increment" of the premium represented a breach of contract and that GMAC's representation to the borrower that the charge was authorized by the contract constituted a violation of the Minnesota Consumer Fraud Act.

While there was no record evidence to quantify this increment of the premium, the district court found that the tracking and expense reimbursement costs re-

flected in the premium were closely tied to the increment. Accordingly, the district court ordered injunctive relief against GMAC, barring it from charging or collecting the "day-one increment," measured by the portion of the premium that reflected the tracking and expense reimbursement costs. The order also requires GMAC to credit borrowers for that increment on all accounts that have already been charged the full collateral-protection premium. This appeal followed.

GMAC filed a motion with this court to strike portions of the deposition transcripts included in Porch's appendix, claiming that those portions had not been received in evidence at trial. We entered an order deferring decision on the motion.

## ISSUES

1. Was the collateral-protection insurance coverage, obtained by GMAC from MIC, broader than the "physical damage insurance" that GMAC was authorized to buy under the installment contracts?

2. Was the amount charged by GMAC to each borrower's account, for premiums paid to MIC, greater than the "cost of the insurance" that GMAC was authorized to charge under the installment contracts?

## ANALYSIS

■■■ In an appeal from a bench trial, we do not reconcile conflicting evidence. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999). We give the district court's factual findings great deference and do not set them aside unless clearly erroneous. Minn. R. Civ. P. 52.01, *Fletcher,* 589 N.W.2d at 101. However, we are not bound by and need not give deference to the district court's decision on a purely legal issue. *Frost Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984). When reviewing mixed questions of law and fact,

we correct "erroneous applications of law, but accord the [district] court discretion in its ultimate conclusions and review such conclusions under an abuse of discretion standard." *Rehn v. Fischley,* 557 N.W.2d 328, 333–34 (Minn.1997).

## I

■■■ We begin our analysis with the breach-of-contract claim. All parties and the district court agreed that the contract was unambiguous and, as such, its interpretation is a question of law. *City of Virginia v. Northland Office Props. Ltd. P'ship,* 465 N.W.2d 424, 427 (Minn.App. 1991), *review denied* (Minn. Apr. 18, 1991). Language in an unambiguous contract is given its "plain and ordinary meaning." *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 67 (Minn.1979) (citations omitted). We read the contract terms in the context of the entire contract. *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.,* 589 N.W.2d 499, 501 (Minn.App.1999).

The district court's analysis of the breach-of-contract claim merged what we believe are two separate concepts under the installment contracts: the scope of the insurance coverage and the cost of the insurance. The district court found, in part, as follows:

> Throughout the relevant period, GMAC purchased and charged customers for physical damage insurance. However, the premium GMAC charged Porch for its [collateral-protection insurance] coverage from MIC was for more than just loss or damage to the [Porch's] vehicle as permitted under the terms of the contract.

We believe that it is necessary to separate the issues of coverage and cost, since each is governed by different language in the installment contracts.

*Scope of Insurance Coverage*

■ Under the installment contracts, GMAC is authorized to buy "physical damage insurance." The collateral-protection certificate issued on January 31, 1993, to GMAC as named insured and Porch as purchaser, provided collision and specified-perils coverage, subject to identified deductibles and coverage limits. The specified-perils coverage applied to loss to the car caused by: fire or explosion; theft; windstorm, hail or earthquake; flood; mischief or vandalism; and the sinking, burning, collision or derailment of any conveyance transporting the vehicle. These coverages are the typical components of "physical damage insurance." Porch does not contend, and the district court did not find, that the coverages described on the collateral-protection certificates were not authorized by the installment contracts.

This distinguishes the present case from *Logan v. Norwest Bank Minn. N.A.*, 603 N.W.2d 659 (Minn.App.1999). There, the collateral-protection insurance, obtained by the creditor when the borrower allowed the car insurance to lapse, included coverages for filing errors and omissions, mechanic's liens, repossession expense and premium deficiency. We held that genuine issues of material fact precluded summary judgment against the borrower on her class action claim that these coverages were not authorized under an installment contract that required only fire, theft and collision insurance. *Id.* at 664. Here, in contrast, the collateral-protection certificate issued for Porch's car did not provide any unauthorized coverage.

Further, the master policy issued by MIC to GMAC does not provide any coverage separate from or additional to the coverage provided on each collateral-protection certificate. Instead, the master policy confirms that MIC only insures the property specifically described in each collateral-protection certificate that is issued to a borrower whose private insurance has lapsed.

Porch argues, and the district court agreed, that the "day-one coverage" feature somehow provides an additional, unauthorized coverage. Thus, in its memorandum, the district court states:

GMAC has not obtained coverage for damage to the individual borrower's car; it has obtained coverage for *all its uninsured losses* throughout the entire segment of its portfolio participating in the [automated insurance follow-up] program. When an individual borrower like Mrs. Porch is found to have lapsed coverage, a portion of the cost of the broad coverage already purchased by GMAC is simply passed on to her. The shifting of the entire risk of uninsured losses to MIC means that the prorated charge to Porch must necessarily be higher than if GMAC had merely replaced her lapsed coverage (which is what the contract says GMAC will do) and charged her for that replacement.

This argument misconstrues the collateral-protection insurance provided by MIC as being something greater than the cumulative coverages provided under the collateral-protection certificates. Our reading of the MIC master policy, and the standard form of the collateral-protection certificates, confirms that MIC does not insure GMAC's uninsured losses in the abstract, or separate and apart from the coverage of specific cars purchased by specific borrowers whose private insurance has lapsed.

■ While it is clear that the goal of GMAC was to reduce its uninsured losses, and it worked with MIC to create "day-one coverage" to avoid losses that could not be detected by tracking, that goal was not achieved by some form of portfolio coverage that insured GMAC against uninsured losses. Instead, that goal was achieved by

insuring the losses that would otherwise have been uninsured, through the issuance of individual certificates to each borrower whose private policy lapsed. In fact, "day-one coverage" is necessary if GMAC is to remedy the harm caused by a borrower's breach of the obligation to provide *continuous* coverage—without "day-one coverage," there would be an inevitable gap between the end of the borrower's insurance and the beginning of the replacement insurance. Stated more directly, we construe the words "physical damage insurance" to include collateral-protection insurance that is designed to assure that the coverage is continuous over the life of the installment contract. The "day-one coverage" feature meets this definition.

Whether the premium for this insurance is greater because the lapse of coverage cannot always be detected by tracking, and a certain number of certificates will be issued after a loss has already occurred, goes not to the question of whether the coverage was authorized by the installment contract, but to the question of whether the charge to the borrower for the resulting premium exceeds the authorized "cost of the insurance," as discussed next.

*Cost of the Insurance*

The district court found that MIC's premiums took into account

> losses to otherwise uninsured vehicles where the lapse in private insurance has come to GMAC's attention only because of the loss and subsequent cessation of payments.

The court found that

> MIC's premiums passed on to the class members were higher than they would have been if the premiums had simply been based upon the risk of damage to the class member's vehicle, as provided for in the contract.

To the extent that this finding was based upon the assumption that day-one coverage was an added coverage, separate from that provided under each collateral-protection certificate, it would be a misconstruction of the insurance issued by MIC, as discussed above. To the extent this finding reflects the view that the premium charged by MIC for the collateral-protection insurance was in excess of the "cost of the insurance" that GMAC was authorized by the installment contract to charge to borrowers, a further analysis is required.

■ We begin with the recognition that the terms that authorize GMAC to charge the borrower for collateral-protection insurance are extremely broad, stating only "the cost of the insurance." Without some limiting language in the installment contract, we find it difficult to disagree with GMAC's simplest argument, that the cost of the insurance is the amount GMAC pays for it—that is, the premium that MIC charges and GMAC pays. Clearly, the ordinary meaning of the word ."cost," in the context of the purchase of insurance, is the premium.

■ Support for this seemingly simplistic construction of "the cost of the insurance" is provided by the general rule in insurance law that, where no rate is specified in a policy, the law implies the obligation to pay the usual and customary premium. *See, e.g., Parlier Fruit Co. v. Fireman's Fund Ins. Co.,* 151 Cal.App.2d 6, 311 P.2d 62, 72 (1957); *Miss. Farm Bureau Mut. Ins. Co. v. Todd,* 492 So.2d 919, 930 (Miss.1986); 5 Eric Mills Holmes, *Holmes' Appleman on Insurance* 24.14 (2d ed.1996). And the law further implies that the usual and customary premium is the premium on file with the appropriate insurance regulatory authority. *See, e.g., Keniston v. Am. Nat'l Ins. Co.,* 31 Cal. App.3d 803, 811, 107 Cal.Rptr. 583 (1973) (holding premium was not excessive where

approved by the insurance commissioner); *Pac. Fire Ins. Co. v. Donald*, 148 Tex. 277, 224 S.W.2d 204, 207 (1949) (stating "[s]ince the rates had been fixed by the State Insurance Commission, it was not essential that they be specifically agreed to by the parties."); *Curtis v. Mitchell–Vincent Co.*, 362 S.W.2d 180, 180 (Tex.App.1962) (holding premium was not excessive where approved by the insurance commissioner).

As a Michigan corporation, MIC is required to file with the Michigan Commissioner of Insurance "every manual of classification, every manual of rules and rates, every rating plan, and every modification" of any of the foregoing which it proposes to use. Mich. Comp. Laws § 500.2108 (1993). Once its premium rates were filed and made effective, MIC was legally obligated to adhere to those rates:

> No insurer shall make or issue a contract or policy except in accordance with filings which are in effect for said insurer as provided in this chapter * * *.

Mich. Comp. Laws § 500.2412 (1993). Similarly, as a foreign insurance corporation doing business in Minnesota, MIC was required to obtain a license from the Minnesota Commissioner of Commerce. Minn.Stat. § 60A.07, subd. 4 (2000). As a licensed insurer, MIC was required to

> file with the commissioner all rates and all changes and amendments of rates made by it for use in this state not later than their effective date.

Minn.Stat. § 70A.06, subd. 1 (2000). And, "[n]o rates contained in a filing shall become effective unless they have been filed with the commissioner." *Id.* Further,

"[n]o policy form shall be delivered or issued for delivery unless it has been filed with the commissioner." Minn.Stat. 70A.06, subd. 2 (2000).

While the above discussion relates to the contract for insurance between an insurance company and its insured (in this case, MIC and GMAC), and we recognize that GMAC could have contractually bound itself to charge some other rate to its borrowers, we find it difficult to construe the broad terms "the cost of insurance" as requiring some rate different from the one MIC filed with the appropriate insurance regulators. In the absence of specific limiting terms, we construe the words "the cost of insurance" to mean the premium rates paid by GMAC to MIC, pursuant to rate filings made by MIC with appropriate insurance regulators. Because Porch makes no claim that the premiums MIC charged to GMAC were not calculated according to the filed rates, we conclude that the premium was not excessive and that it was the cost of the insurance to GMAC.

Even if we were to look beyond the premium charged by MIC and consider the reasonableness of the underlying costs reflected in that premium,[1] we would still conclude that the charges made by GMAC to its borrowers for collateral-protection insurance were authorized by the installment contract. The undisputed testimony before the district court was that the cost of tracking and the related expense reimbursements were considered as an appropriate acquisition cost for collateral-protection insurance, equivalent to the advertising, marketing and agency commissions reflected in the premiums for

---

1. While we need not reach GMAC's primary jurisdiction argument, we recognize the validity of a related argument that the reasonableness of premium rates promulgated pursuant to insurance laws cannot be collaterally attacked in a private action, upon grounds that the insurance company's costs underlying those rates are excessive or inappropriate. *See, e.g., Employers Mut. Liab. Ins. Co. of Wis. v. Warshaw Constr. Corp.*, 51 Misc.2d 709, 273 N.Y.S.2d 745, 746 (N.Y.Sup.Ct.1965) (stating that rates are only subject to judicial review when insurance administrative review procedures are exhausted).

standard automobile policies. As such, these costs are part of the past and prospective expense experience of an insurer, which is appropriately considered in determining the premium. Minn.Stat. § 70A.05(1) (2000); Mich. Comp. Laws 500.2403(1)(a) (1993).

It is true that the "day-one coverage" feature of MIC's collateral-protection insurance may increase its loss experience, because it may require MIC to cover losses that have already occurred. It is likewise true that the resulting premium that MIC must charge for "day-one coverage" will be higher than the premium it would charge if its coverage were not made effective prior to the date that the collateral-protection certificate is issued. But we do not think that a borrower who has breached the installment contract by allowing private insurance to lapse can legitimately complain that the cost of collateral-protection insurance may be higher because other borrowers have likewise allowed their private insurance to lapse. Moreover, the undisputed testimony was that the premiums charged by MIC were lower than the rates of other insurance companies that provide collateral-protection insurance, by as much as 25%.

Absent some specific language in the installment contract requiring that the losses attributable to other borrowers be eliminated from the insurer's loss experience for the calculation of the premium, it would not be reasonable to read "the cost of insurance" to require such an exclusion.

## II

The district court concluded that GMAC had violated the consumer fraud act by stating to plaintiff that the premium charged to her was provided under the terms of her installment contract. This conclusion was based upon the district court's finding that the statement was incorrect because the premium Porch was charged was higher than that "provided under the terms of [her] installment contract." Our conclusion that the charges made to members of the class for collateral-protection insurance were authorized by the installment contract negates this finding and, accordingly, we reverse the conclusion that GMAC violated the consumer fraud act. Further, our decision on the breach-of-contract claim makes it unnecessary for us to address GMAC's other arguments, including those made in GMAC's motion to strike portions of Porch's appendix. That motion is accordingly denied.

## DECISION

The district court erroneously found that GMAC breached the installment contracts with borrowers. The collateral-protection insurance GMAC purchased from MIC qualified as "physical damage insurance" and the premiums that GMAC charged to borrowers' accounts qualified as "the cost of the insurance" under the installment contract. Because the premium GMAC charged borrowers' accounts was authorized by the installment contract, GMAC did not violate the consumer fraud act.

**Reversed; motion denied.**