SLIETER, Judge
Appellant Western National Mutual Insurance Company challenges the district court's award of taxable costs for bad-faith denial of a first-party insurance claim pursuant to Minn. Stat. § 604.18 (2018), arguing the district court misapplied the statute. We affirm.
FACTS
Collision and Initial Treatment
Respondent Alison Peterson was injured in an automobile collision on October 21, 2009 and sustained a whiplash injury. Peterson was not at fault and was covered by an underinsured-motorist (UIM) policy issued by Western National with a policy limit of $ 250,000. Following the collision, Peterson started experiencing severe daily headaches.
In December 2012, after exhausting other treatments, Peterson began receiving periodic Botox injections to alleviate her headaches. After beginning the Botox treatments, Peterson reported that her headaches were reduced by 50%. Her treating neurologist believed that Peterson's injuries were permanent and that Peterson would need Botox injections every three to four months to manage her chronic headaches.
Peterson sought another opinion from a second neurologist. This doctor also opined that Peterson's injuries were permanent and that Peterson will likely need to continue Botox treatments for the rest of her life.
UIM Claim
On January 13, 2014, Peterson notified Western National that her past medical expenses totaled $ 46,235 and her expected future medical expenses would likely exceed $ 300,000. Peterson advised Western National that she would likely seek UIM coverage because the at-fault driver's liability policy had limits of $ 50,000. Ultimately, Peterson settled the liability claim for $ 45,000.
*446 On July 22, 2014, Peterson sent Western National a detailed written settlement demand that requested payment of her $ 250,000 UIM policy limits. Peterson enclosed extensive copies of her medical records. Western National assigned a claims adjuster to Peterson's claim.
Western National made several requests for medical documentation over the next 11 months during which time it neither accepted nor denied the UIM coverage demand. Many of the documents Western National requested had, as the district court found, been previously submitted by Peterson. Peterson had also authorized Western National to obtain her complete medical records.
On June 18, 2015, Peterson sent Western National a letter seeking an update on the status of the claim and repeated her request for the UIM policy limits. Western National did not respond.
In August 2015, Peterson sued Western National seeking to recover UIM benefits. Western National retained counsel to defend the case. After Peterson sued, Western National obtained an independent medical examination (IME). Following an examination of Peterson in March 2016, the IME doctor opined that Peterson suffered only minor soft tissue injuries from the collision and found no causal relationship between the collision and Peterson's headaches. Western National's counsel concluded that Peterson had been fully compensated by the liability settlement with the at-fault driver's insurer and that Western National's UIM exposure was "slim to none."
The parties attended court-ordered mediation on April 4, 2016. To prepare for the mediation, the Western National claims adjuster prepared a summary of Peterson's claim for Western National's claims board. The Western National claims board assigned zero value to Peterson's claim. At mediation, Western National offered to settle the claim for $ 2,000. Western National considered this a "nuisance-value offer." Peterson rejected the settlement offer. After mediation, Peterson offered to settle for $ 200,000; Western National did not accept the offer.
In May 2016, Western National's counsel tried another Botox-treatment chronic-headache case to a jury in Hennepin County. The case involved an automobile collision from which the plaintiff sustained a whiplash injury and then experienced daily headaches that were successfully treated with Botox. The plaintiff prevailed with a damages award totaling over $ 1.1 million. Western National's counsel informed Western National about this verdict, but Western National's counsel concluded that it had no impact on his evaluation of Peterson's case because Peterson had a history of headache problems and the IME doctor had "made a very bad witness for the defense" at the other trial.
On June 1, 2016, Western National offered Peterson a $ 10,000 settlement. Peterson did not accept the offer. After the parties completed depositions of Peterson's medical experts, Western National increased its settlement offer to $ 50,000. Western National's counsel stated this increased offer was made because Western National felt Peterson might be a sympathetic plaintiff.
UIM Trial
Peterson's UIM claim was tried before a jury in August 2016. Both parties presented expert medical testimony regarding the cause of Peterson's headaches. The jury returned a unanimous verdict awarding damages of over $ 1.4 million, including more than $ 900,000 for past and future medical expenses. Western National then paid Peterson the policy limits of $ 250,000. The court granted Peterson leave to *447 amend her complaint to add a bad-faith claim pursuant to Minn. Stat. § 604.18.
Court Trial on Bad-Faith Claim
A court trial on Peterson's bad-faith claim was held in July and August 2017. Both parties presented expert testimony regarding insurance claims handling. Peterson's expert opined that Western National lacked a reasonable basis for denying Peterson's claim and had acted unreasonably in a number of ways, including failing to investigate her claim fairly, "cherry-pick[ing]" her prior medical records, and unreasonably relying on the dollar value of the damage to her vehicle in denying her claim. Western National's expert opined that Western National had reasonably evaluated Peterson's claim because it obtained an IME, Peterson had headache complaints before the collision, Peterson's mother suffered migraines, the collision was minor, and her headaches might be related to her multiple sclerosis.
The district court found that Peterson proved her claim by showing that Western National lacked a reasonable basis to deny her claim and that Western National either knew of, or acted with reckless disregard of, the lack of a reasonable basis for denying the claim. The district court awarded $ 100,000 plus $ 97,940.50 in attorney fees. This appeal follows.
ISSUE
Did the district court misinterpret and misapply Minn. Stat. § 604.18, subd. 2(a), to conclude that Western National lacked a reasonable basis to deny Peterson's UIM claim and that Western National knew of, or acted with reckless disregard of, the lack of a reasonable basis to deny the claim?
ANALYSIS
I. Did the district court misinterpret Minn. Stat. § 604.18, subd. 2(a) ?
The parties dispute the proper interpretation of Minn. Stat. § 604.18, subd. 2(a). The statute provides a discretionary penalty for the unreasonable denial of a first-party insurance claim. The statute sets forth a two-prong test:
(a) The court may award as taxable costs to an insured against an insurer amounts as provided in subdivision 3 if the insured can show:
(1) the absence of a reasonable basis for denying the benefits of the insurance policy; and
(2) that the insurer knew of the lack of a reasonable basis for denying the benefits of the insurance policy or acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the insurance policy.
Minn. Stat. § 604.18, subd. 2(a). The parties disagree over the meaning of the statute's first prong. For the reasons explained below, we believe this statutory phrase is ambiguous because the parties have identified more than one reasonable interpretation of the phrase.
We review the interpretation of a statute de novo. Frandsen v. Ford Motor Co. , 801 N.W.2d 177, 181 (Minn. 2011). The aim of statutory interpretation is to effectuate the legislature's intent. State Farm Mut. Auto. Ins. Co. v. Lennartson , 872 N.W.2d 524, 529 (Minn. 2015). We first determine "whether the statute's language, on its face, is ambiguous." Am. Tower, L.P. v. City of Grant , 636 N.W.2d 309, 312 (Minn. 2001). "A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." Id. (quotation omitted).
Section 604.18 does not define "absence of a reasonable basis," and no *448 Minnesota cases have addressed the issue. "We give words and phrases in a statute their plain and ordinary meaning, and technical words and phrases ... are construed according to [their] special meaning or their definition." Staab v. Diocese of St. Cloud , 813 N.W.2d 68, 72 (Minn. 2012) (alteration in original) (quotation omitted). "Whether a word is used in a technical sense is based on the context in which it is used." Briles v. 2013 GMC Terrain , 907 N.W.2d 628, 633 (Minn. 2018).
Here, "absence of a reasonable basis" is used in the context of first-party insurance coverage and is a technical term. See id. (determining that the phrase "right, title, and interest" is a technical term). Many states use "absence of a reasonable basis" or similar phrases in their first-party bad-faith jurisprudence, and this results in many different and reasonable interpretations. See, e.g. , Anderson v. Cont'l Ins. Co. , 85 Wis.2d 675, 271 N.W.2d 368, 376 (1978) ("To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."); Bellville v. Farm Bureau Mut. Ins. Co. , 702 N.W.2d 468, 473 (Iowa 2005) (recognizing that to establish bad-faith, a plaintiff must prove "(1) [the insurer] had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, and (2) the defendant knew or had reason to know that its denial or refusal was without reasonable basis"); Darlow v. Farmers Ins. Exch. , 822 P.2d 820, 824 (Wyo. 1991) ("[T]he insured must show the absence of a reasonable basis for the insurer to deny the benefits of the policy.... [And] knowledge or reckless disregard of the lack of a reasonable basis for denying the claim ...."). Similarly, these states refer to their standard as the "fairly debatable" standard, though, as noted, it means different things in different jurisdictions. See, e.g. , Anderson , 271 N.W.2d at 376 (stating "when a claim is 'fairly debatable,' the insurer is entitled to debate it"); Bellville, 702 N.W.2d at 473 (stating that a "claim is 'fairly debatable' when it is open to dispute on any logical basis"). As may be expected, the parties offer competing interpretations of what it means to show an "absence of a reasonable basis" for denying a claim, and base their positions on various out-of-state jurisprudence.
Western National contends that, to establish the first prong, Peterson was required to "prove there [were] no facts or evidence upon which [Western National] could rely to deny coverage." Citing Iowa law, which uses the same bad-faith language as Minnesota but is based in common law, Western National asserts that the "appropriate inquiry for the district court was not whether it believed the evidence Western National relied upon, but whether such evidence existed." "[C]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim." Bellville, 702 N.W.2d at 474 (quotation omitted). Western National argues "the district court misapplied the law to these facts by weighing the evidence rather than determining whether there was an absence of competing evidence that made it objectively unreasonable to dispute the UIM claim." In other words, Western National is suggesting that the fact that it had any "competing evidence," e.g., the IME, means that a claim under section 604.18 should fail.
Western National also cites to law from a number of other jurisdictions, including the Dutton rule, which requires a plaintiff to obtain a directed verdict at the underlying trial before bringing a claim for bad-faith denial of benefits.
*449 Nat'l Sav. Life Ins. Co. v. Dutton , 419 So. 2d 1357, 1362 (Ala. 1982). Western National further contends that a reliance-on-counsel defense should be read into the statute, arguing that if an insurer relies on the advice of counsel, no bad-faith claim should be allowed.
Peterson disagrees, arguing that the district court properly interpreted the first prong of the statute using what is known in Wisconsin as the Anderson framework.[1] See Anderson , 271 N.W.2d at 376. Like Iowa, Wisconsin's bad-faith claims are based on common law, and it uses a two-prong test that mirrors Minnesota's statute. Id. Pursuant to the first prong, a court asks whether "a reasonable insurer under the circumstances [would] have denied or delayed payment of the claim under the facts and circumstances." Id. at 377. "It is appropriate, in applying the test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." Id.
In other words, under the first prong of the Anderson test, to determine whether the insurer acted in bad faith the trier of fact measures the insurer's conduct against what a reasonable insurer would have done under the particular facts and circumstances to conduct a fair and neutral evaluation of the claim.
Weiss v. United Fire & Cas. Co. , 197 Wis.2d 365, 541 N.W.2d 753, 757 (1995) (footnote omitted).
Because we are confronted with more than one reasonable interpretation of what "absence of a reasonable basis" means, the phrase is ambiguous. If a statute is ambiguous, we "may consider the factors set forth by the [l]egislature for interpreting a statute." Christianson v. Henke , 831 N.W.2d 532, 537 (Minn. 2013) (quotation omitted). When construing statutory language, we ascertain legislative intent by considering, among other things, "the legislative history of the act under consideration, the subject matter as a whole, the purpose of the legislation, and the objects intended to be secured thereby." Staab v. Diocese of St. Cloud , 853 N.W.2d 713, 718 (Minn. 2014) (quotation omitted); Minn. Stat. § 645.16 (2018) (providing factors to be considered in ascertaining legislative intent).
The legislature enacted Minn. Stat. § 604.18 in 2008, creating a cause of action for an insurer's bad-faith denial of first-party insurance benefits. 2008 Minn. Laws ch. 208, §§ 1-2, at 1-3. As noted, the statute includes a two-pronged test and is similar to several other states' first-party bad-faith jurisprudence. The author of the bill, Senator Tarryl Clark, explained that the bill "gives a bit of deterrent to those who may be making low settlement offers with no intention of making good on what the consumer's actual damages are under the policy." S. Floor Deb. on S.F. 2822 (Apr. 14, 2008) (statement of Sen. Clark).
In a March 18, 2008 senate floor debate, Senator Clark explained that the "two-part test that is in the bill in front of you is what is often known as the Anderson standard that is in Wisconsin." S. Floor Deb. on S.F. 2822 (Mar. 18, 2008) (statement of Sen. Clark).
Then Senator Linda Scheid (who, it appears, was working on a competing bad-faith bill: S.F. 3116) offered a significant amendment to Senator Clark's bill. In doing so, Senator Scheid noted that her amendment "leaves the standard for showing a lack of good faith as is currently included in Senator Clark's bill ... we would be incorporating in our statute what *450 is common law in Wisconsin ... I have adopted in this amendment what Senator Clark has in her bill regarding that standard." S. Floor Deb. on S.F. 2822 (Mar. 18, 2008) (statement of Sen. Scheid). In a subsequent senate floor debate, Senator Scheid stated, "[W]e are adopting that specific test from that so-called Anderson case ... we are not adopting any of the subsequent caselaw." S. Floor Deb. on S.F. 2822 (Apr. 14, 2008) (statement of Sen. Scheid).
Comments made in committees or floor debates "are to be treated with caution. Statements made, however, by the sponsor of a bill or an amendment on the purpose or effect of the legislation are generally entitled to some weight." Handle With Care, Inc., v. Dep't. of Human Servs. , 406 N.W.2d 518, 522 (Minn. 1987) (footnote omitted). The legislative history leads us to conclude that the legislature intended the Anderson framework to apply to Minn. Stat. § 604.18 claims.[2]
Thus, pursuant to Minn. Stat. § 604.18, subd. 2(a), an insurer must conduct a reasonable investigation and fairly evaluate the results to have a reasonable basis for denying an insured's first-party insurance-benefits claim. If, after a reasonable investigation and fair evaluation, a claim is fairly debatable, an insurer does not act in bad-faith by denying the claim. Having concluded that the district court properly interpreted the statute, we next determine whether the district court correctly applied this interpretation to the facts.
II. Did the district court misapply Minn. Stat. § 604.18, subd. 2(a) ?
Western National contends that even under the Anderson framework, the district court erred in determining that Peterson proved her bad-faith claim. We disagree.
On appeal from a court trial, we set aside a district court's factual findings only if clearly erroneous. Porch v. Gen. Motors Acceptance Corp. , 642 N.W.2d 473, 477 (Minn. App. 2002), review denied (Minn. June 26, 2002). And, while we correct erroneous applications of law, we accord the district court discretion in its ultimate conclusions and review such conclusions under an abuse-of-discretion standard. Id.
The first prong of Minn. Stat. § 604.18, subd. 2(a), requires Peterson to show that Western National lacked a reasonable basis to deny the claim. The district court concluded that, although Western National did not offer to settle or deny Peterson's claim for nearly a year, "[Western National] produced no evidence of a reasonable evaluation during that eleven-month time period to develop a reasonable basis to delay or deny [Peterson's] claim." The district court found that, early on, before obtaining an IME, Western National took the position that Peterson's headaches were not caused by the collision but were related to headaches she experienced years before the collision. This was in spite of the substantial medical records Peterson submitted to Western National, which records it already possessed, showing that she now had chronic, severe headaches, and that before the collision, she had only occasional headaches that did not require medical treatment. Western National's claims adjuster refused to admit that these medical records showed Peterson had post-collision chronic headaches until confronted with them at trial.
*451 The district court also found that Western National's claims adjuster presented a claims summary to Western National's claims board that "did little to present the merits of [Peterson's] claim" and was "tilted toward supporting [Western National's] ability to deny [Peterson's] claim." The district court found that the claims summary included significant misstatement of facts, including that Peterson did not report a headache on the day of the collision, and that her headaches after the collision were similar to her headaches before the collision. The claims summary suggested that Western National could argue comparative fault, despite the other driver admitting fault, and failed to include an important report from Peterson's second neurologist, who opined that her chronic headaches were attributable to the collision, and that she would need Botox treatments for the rest of her life.
Further, the district court found that Western National failed to weigh the competing medical opinions, noting that "[Western National's] claims file does not reflect any analysis of how [the IME doctor's] opinions compared to the opinions of [Peterson's] treating physicians." Rather, Western National "consistently and repeatedly looked only for evidence to support its decision to assign zero value to [Peterson's] claim, instead of considering all of the evidence, including the evidence that might support her claim."
In sum, the district court found that Western National (1) delayed settling or denying Peterson's claim for nearly a year without properly investigating her claim, (2) ignored Peterson's evidence supporting her claim, (3) prepared a claims summary that misstated significant facts, and (4) failed to evaluate and weigh the competing medical opinions. Thus, the district court appropriately determined "whether [Peterson's] claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." Anderson , 271 N.W.2d at 377. It did not abuse its discretion in concluding that Western National lacked a reasonable basis for denying Peterson's claim because Western National failed to properly investigate and fairly evaluate her claim.
The second prong of section 604.18, subdivision 2(a), requires Peterson to show that Western National knew, or acted in reckless disregard, of the lack of a reasonable basis for denying the claim. The district court found that Western National "made no settlement offer for more than a year after [Peterson] presented her claim, and its eventual settlement offers were based purely on nuisance value, not on a reasonable evaluation of the merits of [Peterson's] claim." "[B]y assigning nothing more than nuisance value to [Peterson's] claim, [Western National] assigned a 100% probability to its likelihood of defeating the claim, and 0% to [Peterson's] likelihood of recovering on her claim." The district court concluded that, "[i]n doing so," Western National " 'recklessly ignored and disregarded' facts that, fairly evaluated, would have resulted in at least some probability of success being assigned to [Peterson's] position."[3]
As the district court noted, pursuant to the Anderson framework, "knowledge *452 of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." Anderson , 271 N.W.2d at 377. The district court did not abuse its discretion in concluding that Western National acted in reckless disregard of the lack of a reasonable basis for denying Peterson's claim.
DECISION
The district court did not err in using the Anderson framework to interpret Minn. Stat. § 604.18, subd. 2(a), and it did not abuse its discretion in concluding Peterson proved her claim. We, therefore, affirm the district court.
Affirmed.
Dissenting, Schellhas, Judge

The district court followed a Minnesota federal decision which interpreted section 604.18 using Wisconsin's meaning of "absence of a reasonable basis." See Friedberg v. Chubb & Son, Inc. , 800 F. Supp. 2d 1020, 1025 (D. Minn. 2011).

We note that, in light of Senator Scheid's statement, the legislature did not intend to adopt Wisconsin caselaw subsequent to Anderson . We cite Weiss , 541 N.W.2d at 757 only for its summarization of Anderson 's first prong.

Western National objects to the district court's use of the unrelated Botox-treatment case tried by Western National's counsel as part of its legal analysis. In considering the unrelated Botox-treatment case, the district court noted that "[w]hile one jury may disagree with another, the [unrelated case] verdict was a significant data point that [Western National] should have evaluated by considering both its similarities and its differences as compared to this case." Because the district court used this case as only a factor in its analysis, we see no error.